CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
October 17, 2025

LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
       DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

| | | |
|---|---|---|
| Tamara Christine Thompson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:25-cv-00003 |
| | ) | |
| Cenlar, FSB *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Tamara Christine Thompson ("Ms. Thompson") alleges that certain family members and their associates took her house and personal property through a scheme involving fraud and other criminal conduct. Her amended complaint alleges claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as state-law claims for common-law conspiracy, conversion, trespass to chattels, gross negligence, breach of fiduciary duty, and violations of the Virginia Computer Crimes Act.

This matter is before the court on motions to dismiss filed by Defendants Quincy Manning Thompson (Dkt. 17), Samson Companies, LLC ("Samson") (Dkt. 19), Second Chance Homes, LLC (Dkt. 21), Cenlar, FSB (Dkt. 36), and David J. Ottey (Dkt. 49), as well as Ms. Thompson's motions for default judgment against Defendants Clayton H. Thompson (Dkt. 44), Annette Jackson (Dkt. 45), and Shannon Marie Nugent Hicks (Dkt. 46). For the reasons that follow, the court will grant Defendants' motions to dismiss and deny Ms. Thompson's motions for default judgment.

## I. Background

### A. Factual History[1]

Most of the events described in Ms. Thompson's amended complaint relate to her interest in a house located at 36 Gusty Court in Charles Town, West Virginia (the "Gusty Court property"). In June 2006, Ms. Thompson, her then-husband Brian Thompson, and her father-in-law Clayton Thompson executed a deed of trust to purchase the property for $297,000. (Am. Compl. ¶ 19 (Dkt. 11); Dkt. 11-1 at 1.) Ms. Thompson and Brian Thompson signed a promissory note for the $ 297,000 loan. (Dkt. 11-1 at 9–11.) Cenlar, FSB was the sub-servicer of the loan during the relevant period. (Am. Compl. ¶ 22.) As the sub-servicer, it collected loan payments and handled any correspondence about the loan. (*Id.* ¶ 27.) Ms. Thompson made monthly loan payments to Cenlar. (*Id.* ¶¶ 22, 26.)

Between 2014 and 2020, Brian Thompson became increasingly abusive to Ms. Thompson. (*Id.* ¶ 37.) To "intimidate her into giving him financial aid," he often confiscated her bank cards and left her in various places without any means of identification or transportation. (*Id.*) On an unspecified date, Brian Thompson, with help from Clayton Thompson, took out a large life insurance policy on Ms. Thompson without her knowledge. (*Id.* ¶ 39.) The couple separated in April 2018, at which point Ms. Thompson moved to Ohio. (*Id.* ¶ 38.)

---

[1] The facts in this section are taken from Ms. Thompson's amended complaint and the exhibits she attached to that pleading. The court accepts the facts alleged in the amended complaint as true when resolving the motions to dismiss and motions for default judgment. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001).

It is unclear how long Ms. Thompson lived in Ohio, but it appears that she was back in West Virginia as of late 2020. (*See id.* ¶¶ 44–46.) On October 29, 2020, she and Brian Thompson signed a marital settlement agreement. (*Id.* ¶ 44; *see* Dkt. 11-1 at 59–73.) Ms. Thompson states that Brian Thompson took her to a law office in Charles Town against her will to sign the agreement. (Am. Compl. ¶ 46.) At the time, she was "disoriented," "terrified," and on medication that "rendered her incapable of reading or comprehending documents." (*Id.*) Ms. Thompson was unaware of the terms of the agreement, but an attorney at the law office "demanded that [she] sign[] it." (*Id.* ¶¶ 46–47.) The agreement provided that Ms. Thompson would "promptly sign a quit claim deed transferring all of her right, title, and interest in the [Gusty Court property] to the remaining owners of the property." (Dkt. 11-1 at 63.) It gave Brian Thompson exclusive use and possession of the property, made him solely responsible for all associated costs "including the lien indebtedness," and required Ms. Thompson to "immediately vacate the property." (*Id.*) Despite that provision, Ms. Thompson apparently was not removed as a party to the mortgage loan. (*See, e.g., id.* at 82.)

The same day Ms. Thompson signed the marital settlement agreement, a quitclaim deed was executed to transfer her interest in the property to Brian and Clayton Thompson. (Am. Compl. ¶¶ 41, 43; *see* Dkt. 11-1 at 49–53.) The quitclaim deed includes a signature in her name and was notarized. (Dkt. 11-1 at 51.) Ms. Thompson states that she was not aware of the deed, did not sign it, and was not present at the time of signing. (Am. Compl. ¶¶ 41–42.) She suggests that an unidentified person forged her signature. (*See id.* ¶¶ 41–43.) The deed was recorded in the Land Records of Jefferson County, West Virginia. (*Id.* ¶ 43.) Ms. Thompson

- 3 -

alleges that someone also forged her signature on a December 3, 2020 correction deed that fixed a typographical error in the quitclaim deed.  (*Id.* ¶¶ 51–53.)

Around the same time the marital settlement agreement and quitclaim deed were signed, Brian and Clayton Thompson altered Ms. Thompson's "log-in information" (presumably for her Cenlar account) so she could not access the account except via phone call.  (*Id.* ¶ 40.)  They simultaneously restricted her access to her phone and mail.  (*Id.*)  Nevertheless, Ms. Thompson states that she continued making loan, tax, and insurance payments for the Gusty Court property and "believed she was still the owner of the Property."[2]  (*Id.* ¶ 54.)  Ms. Thompson was once again living at the property during this period, but as a result of the quitclaim deed, Jefferson County authorities forced her to vacate the property in December 2020.  (*Id.* ¶ 55.)

On May 12, 2021, Brian and Clayton Thompson entered the loan into a forbearance plan set to end in November 2021.  (*Id.* ¶ 56.)  Ms. Thompson states that they obtained access to her Cenlar account and entered the forbearance plan without her knowledge or permission. (*Id.* ¶¶ 56–57.)  On October 4, 2021, Brian and Clayton Thompson called Cenlar a second time, and "using the stolen credentials for Ms. Thompson's private account," extended the forbearance plan to end on May 4, 2022.  (*Id.* ¶ 63.)  Ms. Thompson alleges that the forbearance plan left her with a $44,000 "balloon payment" she was unable to pay.  (*Id.* ¶¶ 57, 73.)

---

[2] In a December 3, 2023 letter to Cenlar, by contrast, Ms. Thompson stated that "[n]o payments were made on the mortgage from October 2020 until October 2023."  (Dkt. 11-1 at 81.)

- 4 -

Ms. Thompson moved to Virginia after her December 2020 eviction from the Gusty Court property. (*Id.* ¶ 64.) On September 18, 2021, Brian Thompson found her at a motel in Winchester, Virginia. (*Id.* ¶ 58.) He threatened her life and the lives of her children if she refused to sign over a $30,000 check to him. (*Id.* ¶ 59.) After Ms. Thompson signed the check, Brian Thompson forced her into his vehicle, "used his cell phone to electronically access [her] private bank account," and transferred a social security disability payment into his own account. (*Id.* ¶¶ 60–61.) He then drove her to Hagerstown, Maryland, where he left her without any money, method of communication, identification, or transportation. (*Id.* ¶ 61.)

Brian Thompson died on February 11, 2022. (*Id.* ¶ 65.) After his death, Ms. Thompson moved back to the Gusty Court property at the request of Quincy Thompson, Brian Thompson's son. (*Id.* ¶ 66.) Her return to the house was short-lived. On March 17, 2022, she again "lost access" to the house "due to yet more threats from Clayton Thompson." (*Id.* ¶ 69.) She moved back to Virginia to live with her mother for a period of time. (*Id.*)

Meanwhile, members of the Thompson family continued accessing the Cenlar loan account. On May 4, 2022, Quincy Thompson, with help from Clayton Thompson and Annette Jackson, Clayton Thompson's "significant other," called Cenlar and obtained account information without Ms. Thompson's knowledge or consent. (*Id.* ¶¶ 71, 136.) Cenlar later addressed mail regarding the mortgage to Quincy Thompson "even though he was not (and never had been) on the Loan." (*Id.* ¶¶ 72, 75–76; *see* Dkt. 11-1 at 43–46.) Clayton and Quincy Thompson also "open[ed] numerous fraudulent utility and Xfinity accounts" in Ms. Thompson's name. (Am. Compl. ¶ 68.)

On February 8, 2023, Cenlar initiated foreclosure proceedings on the Gusty Court property due to an unpaid mortgage installment. (*Id.* ¶ 74.) In an attempt to avoid foreclosure, Ms. Thompson filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of Virginia on May 8, 2023. (*Id.* ¶ 77.) The bankruptcy case was dismissed that October. (*Id.* ¶ 79.) As of May 2023, Ms. Thompson was once again living at the Gusty Court property, and Clayton Thompson filed an unlawful detainer action on September 12, 2023, to seek her eviction. (*Id.* ¶¶ 70, 78.) Clayton Thompson apparently prevailed in that case, as Ms. Thompson was evicted from the house a third time on October 23, 2023. (*Id.* ¶ 84.)

Ms. Thompson called Cenlar on October 10, 2023, to make a report of fraud and later sent exhibits in support of her claims. (*Id.* ¶¶ 81, 85.) Cenlar did not take any action in response. (*Id.* ¶ 87.)

On February 20, 2024, a Cenlar representative informed Ms. Thompson that a man claiming to be Brian Thompson (who had died two years earlier) had called and "asked for access to Ms. Thompson's personal account." (*Id.* ¶ 93.) The representative told Ms. Thompson that another man, who identified himself as David Ottey from Samson Properties, had called Cenlar shortly thereafter. (*Id.*) Ottey reportedly stated that he was Ms. Thompson's realtor and that "Ms. Thompson was dead." (*Id.*) Ottey provided Ms. Thompson's birthdate and social security number and told the representative that "he needed access to her mortgage account to pay off the mortgage." (*Id.*) Ms. Thompson did not know Ottey and had never heard of Samson Properties. (*Id.* ¶ 95.) Cenlar gave Ottey access to the account. (*Id.* ¶ 97.) When Ottey gained access, he changed the account password so Ms. Thompson could not log into the account. (*Id.* ¶ 97.)

- 6 -

Ms. Thompson drove to the Gusty Court property later that same day. (*Id.* ¶¶ 100–01.) When she arrived, she learned that another vehicle had just driven away with some of her furniture. (*Id.* ¶ 101.) Clayton Thompson was at the property, as was Ottey, who introduced himself as Clayton Thompson's realtor and gave Ms. Thompson a business card that showed he was a broker for Samson Properties. (*Id.* ¶¶ 103–05, 108.) Ms. Thompson states that Ottey then "attempted to coerce [her] into signing a paper that conveyed her Property to him." (*Id.* ¶ 107.) When she refused, Ottey stated, "You have to sign this paperwork or you're really gonna lose everything!" (*Id.*) He added, "If you die, the property will go to Clayton anyway." (*Id.*)

The next day, Ms. Thompson retrieved her remaining items from the Gusty Court property with help from her adoptive sister, Shannon Marie Nugent Hicks. (*Id.* ¶¶ 109–10.) Clayton Thompson, Quincy Thompson, and Annette Jackson were there at the same time. (*Id.* ¶ 110.) Ms. Thompson states that she observed Clayton Thompson and Jackson "continuing to rob the property." (*Id.*) Ms. Thompson asked Hicks to drive a U-Haul vehicle containing her personal property to a storage unit, but Hicks instead drove the vehicle to her own house and took some of the items. (*Id.* ¶¶ 111–13.)

Around March 22, 2024, Clayton Thompson signed a deed conveying the Gusty Court property to Second Chance Homes, LLC, a business owned by Ottey, for $235,000. (*Id.* ¶¶ 4, 116–17; *see* Dkt. 11-1 at 88–89.) Three days later, Cenlar received a payment of $215,811.25—the payoff amount for the mortgage—from a bank account registered "in Ms. Thompson's name." (Am. Compl. ¶¶ 114–15, 119.) Ms. Thompson did not create the account and does not have access to it; there is no indication that it contained any of her funds. (*Id.* ¶ 115.) On

April 12, 2024, Cenlar released the deed of trust to "a very surprised Ms. Thompson."  (*Id.*
¶ 121; *see* Dkt. 11-1 at 91–93.)

After Second Chance Homes purchased the Gusty Court property, Ms. Thompson
visited the property and observed Ottey removing more of her personal belongings.  (*Id.*
¶ 123.)  She states that Ottey and other Defendants also "destroyed at least $25,000.00 worth
of [her] property by pouring toxic substances on said property."  (*Id.* ¶ 124.)  Ottey later
continued removing fixtures, appliances, and other items from the property.  (*Id.* ¶ 125.)

### B. Procedural History

Ms. Thompson filed her original complaint in this court on January 13, 2025.  (*See*
Compl (Dkt. 1).)  She filed an amended complaint on February 27, 2025.  (Am. Compl.)  It
names nine Defendants: Cenlar, Samson Companies, Second Chance Homes, Clayton
Thompson, Quincy Thompson (both individually and as administrator for the Estate of Brian
Thompson), David Ottey, Annette Jackson, Sharon Marie Nugent Hicks, and one unnamed
Jane Doe defendant.  (*See id.* ¶¶ 2–11.)

The amended complaint alleges ten causes of action.  Counts 1 and 2 allege civil RICO
claims against Clayton Thompson, the Estate of Brian Thompson, Quincy Thompson,
Jackson, Ottey, and Second Chance Homes for violations of 18 U.S.C. § 1962(c) and
§ 1962(d).  (*Id.* ¶¶ 128–56.)  Counts 3 through 10 assert Virginia state-law claims against one
or more Defendants for common-law conspiracy, conversion, trespass to chattels, gross
negligence, breach of fiduciary duty, and violations of the Virginia Computer Crimes Act.  (*Id.*
¶¶ 157–226.)  Ms. Thompson seeks to recover compensatory, treble, and punitive damages.
(*Id.* at 50–52.)

Defendants Quincy Thompson, Samson, Second Chance Homes, Cenlar, and Ottey filed separate motions to dismiss the amended complaint. (Quincy Thompson Mot. to Dismiss (Dkt. 17); Samson Mot. to Dismiss (Dkt. 19); Second Chance Homes Mot. to Dismiss (Dkt. 21); Cenlar Mot. to Dismiss (Dkt. 36); Ottey Mot. to Dismiss (Dkt. 49).) Ms. Thompson filed responses opposing those motions. (Opp'n to Quincy Thompson Mot. to Dismiss (Dkt. 25); Opp'n to Second Chance Homes Mot. to Dismiss (Dkt. 28); Opp'n to Samson Mot. to Dismiss (Dkt. 35); Opp'n to Cenlar Mot. to Dismiss (Dkt. 42); Opp'n to Ottey Mot. to Dismiss (Dkt. 51).) All movants except Ottey filed reply briefs. (Quincy Thompson Reply (Dkt. 26); Second Chance Homes Reply (Dkt. 38); Samson Reply (Dkt. 40); Cenlar Reply (Dkt. 43).)

Defendants Clayton Thompson, Annette Jackson, and Shannon Marie Nugent Hicks did not file any response to the amended complaint.[3] On May 6, 2025, Ms. Thompson filed motions for default judgment against those Defendants. (Dkts. 44, 45, 46.)

## II.    Motions to Dismiss

All five Defendants who have filed motions to dismiss—Quincy Thompson, Samson, Second Chance Homes, Cenlar, and Ottey—argue that the amended complaint fails to state any plausible claim for relief and therefore must be dismissed under Federal Rule of Civil Procedure 12(b)(6). Ottey also moves to dismiss the claims alleged against him for lack of personal jurisdiction under Rule 12(b)(2).[4]

---

[3] Hicks previously appeared and filed a *pro se* motion to dismiss Ms. Thompson's original complaint. (Dkt. 10.) Neither Clayton Thompson nor Jackson has made any appearance after receiving service of the original complaint. (*See* Dkts. 30, 32.)

[4] Samson additionally moves to dismiss for insufficient process under Rule 12(b)(4) and for insufficient service of process under Rule 12(b)(5). (Samson Mem. at 5–8 (Dkt. 20).) Samson argues that Ms. Thompson made two defective attempts

### A. Standard of Review

Rule 12(b)(2) provides that a defendant may file a motion to dismiss for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). Whether personal jurisdiction may be exercised is a question "for the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59–60 (4th Cir. 1993). Where, as here, a district court resolves a Rule 12(b)(2) motion without conducting an evidentiary hearing, "the plaintiff need only make a prima facie showing of personal jurisdiction." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003); *see Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). The analysis "resembles the plausibility inquiry governing motions to dismiss for failure to state a claim under Rule 12(b)(6)." *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2019). The court must determine "whether the facts proffered by the party asserting jurisdiction—assuming they are true—make out a case of personal jurisdiction over the party challenging jurisdiction." *Id.* In making that determination, the court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs*, 886 F.2d at 676.

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). It does not "resolve contests

---

at service: first on January 16, 2025, when she failed to provide a summons or the exhibits to the complaint, and again on January 23, 2025, when she served a summons that was not signed by the Clerk of Court and lacked the seal of this court. (*Id.*; *see* Dkt. 20-1.) In response to Samson's motion to dismiss, Ms. Thompson submitted an affidavit from a process server, which indicates that she rectified the earlier issue by personally serving the original complaint and a proper summons on Samson's registered agent on February 18, 2025. (Opp'n to Samson Mot. to Dismiss at 4–6; Dkt. 35-1.) Samson does not dispute that representation in its reply brief. (*See* Samson Reply.) Ultimately, the court does not need to resolve this issue. Ms. Thompson alleges only state-law claims against Samson, and for the reasons discussed in this opinion, the court will decline to exercise supplemental jurisdiction over those claims.

surrounding the facts or the merits of a claim." *Doriety for Est. of Crenshaw v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024) (internal quotation marks omitted). To survive a Rule 12(b)(6) motion, a complaint must allege sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When reviewing a Rule 12(b)(6) motion to dismiss, the court must "accept as true all well-pleaded facts in a complaint and construe them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017). To state a plausible claim, though, the complaint must allege more than "labels and conclusions" or "naked assertion[s]" unsupported by "further factual enhancement." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557). In addition to reviewing the facts alleged in the complaint, a court may consider documents attached to the complaint as exhibits or those explicitly incorporated into the complaint by reference. Fed. R. Civ. P. 10(c); *see Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

## B. Analysis

### 1. This court may exercise personal jurisdiction over Ottey.

Ottey argues that he is not subject to personal jurisdiction in Virginia because his alleged conduct occurred entirely in West Virginia. (Ottey Mem. at 5–6 (Dkt. 49-1).) As an initial matter, Ms. Thompson argues that Ottey has waived any challenge to personal jurisdiction because his counsel failed to make a special appearance and therefore consented to the court's exercise of jurisdiction. (Opp'n to Ottey Mot. to Dismiss at 4–6.) The court

disagrees.  "[T]he distinction between general and special appearances in federal practice has been abolished" since the adoption of Rule 12(b).  *Hunt v. Calhoun Cnty. Bank, Inc.*, 8 F. Supp. 3d 720, 726 (E.D. Va. 2014) (quoting *Davenport v. Ralph N. Peters & Co.*, 386 F.2d 199, 204 (4th Cir. 1967)).  "There is no longer any necessity for appearing specially, as [Rule 12(b)] provides that every defense may be made either in the responsive pleading or by motion."  *Davenport*, 386 F.2d at 204.  Instead, under Rule 12, a defendant waives a personal jurisdiction defense when they fail to raise it in their Rule 12(b) motion or responsive pleading.  Fed. R. Civ. P. 12(h)(1).

Here, Ottey raised a personal jurisdiction defense in a timely Rule 12(b) motion to dismiss, which was his first responsive filing in this case.  While Ottey also moves to dismiss the amended complaint for failure to state a claim, "[n]o defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion."  Fed. R. Civ. P. 12(b).  Ms. Thompson also argues that Ottey's counsel effectively consented to the exercise of personal jurisdiction by participating in emails with counsel for other parties about trial dates for this matter.  (*See* Opp'n to Ottey Mot. to Dismiss at 5.)  But she cites no authority that suggests such conduct—which was prompted by directions from the court—precludes Ottey from raising a personal jurisdiction defense in a timely Rule 12(b) motion.  Ottey's objections to personal jurisdiction are properly before the court.

Ms. Thompson agrees that Ottey is not subject to general personal jurisdiction in Virginia, as he is not domiciled in the Commonwealth, but she contends that he *is* subject to specific personal jurisdiction.  (*Id.* at 6–9.)  To resolve that question, the court first must consider whether the law of Virginia—the state in which this court is located—authorizes

personal jurisdiction over a nonresident defendant like Ottey. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009); *see* Fed. R. Civ. P. 4(k)(1)(A). If it does, the court then must determine whether exercising personal jurisdiction comports with the due process requirements of the Fourteenth Amendment to the United States Constitution. *Consulting Eng'rs Corp.*, 561 F.3d at 277. Virginia's long-arm statute "extends personal jurisdiction over nonresident defendants to the full extent permitted by the Fourteenth Amendment's Due Process Clause." *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 350–51 (4th Cir. 2020). As a result, the statutory and constitutional questions "merge into one inquiry" that asks whether the exercise of personal jurisdiction "comports with the strictures of constitutional due process." *Id.* at 351.

To satisfy those due process requirements, Ms. Thompson must show that Ottey has sufficient "minimum contacts" with Virginia "such that 'the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Consulting Eng'rs Corp.*, 561 F.3d at 277 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "[T]he minimum contacts analysis must focus 'on the relationship among the defendant, the forum, and the litigation.'" *UMG Recordings*, 963 F.3d at 351 (quoting *Walden v. Fiore*, 571 U.S. 277, 283 (2014)). For a court to exercise specific personal jurisdiction, "there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 262 (2017) (internal quotation marks omitted). The Fourth Circuit applies a three-part test for analyzing the due process requirements for specific jurisdiction, which focuses on: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting

activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *UMG Recordings*, 963 F.3d at 351–52 (quoting *Consulting Eng'rs Corp.*, 561 F.3d at 278).

Ottey argues—in a single paragraph—that his contacts with Virginia do not satisfy those requirements. (Ottey Mem. at 6.) He contends that Ms. Thompson's claims arise from his alleged conduct in West Virginia and that there is no indication he purposefully availed himself of the privileges of conducting activities in Virginia. (*Id.*) Some of the allegations in the amended complaint suggest otherwise. Ms. Thompson acknowledges that Ottey resides in West Virginia, but also alleges that he "does substantial business in Winchester, Virginia, at a Winchester branch of Samson Properties." (Am. Compl. ¶ 8.) That allegation supports Ms. Thompson's argument that Ottey purposefully availed himself of the privilege of conducting business under Virginia laws. *See Sneha Media & Entm't, LLC v. Assoc. Broad. Co. P. Ltd.*, 911 F.3d 192, 198–99 (4th Cir. 2018) (noting that the factors relevant to purposeful availment inquiry include "whether the defendant maintained offices . . . in the State" and "whether the defendant deliberately engaged in significant or long-term business activities in the State"). The amended complaint is thin on factual detail regarding Ottey's business activities in Virginia, but the fact that he does substantial business at a Samson branch in Virginia indicates that "it is presumptively not unreasonable to require him to submit to the burdens of litigation" in the Commonwealth. *Consulting Eng'rs Corp.*, 561 F.3d at 278 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

In addition, the allegations in the amended complaint suggest that Ms. Thompson's claims against Ottey arise at least in part from activities he directed at Virginia. They state that Ottey acted within the scope of his employment with Samson, his Virginia-based employer, when he called Cenlar to gain access to Ms. Thompson's account, and that he used a Samson computer network to access the account. (Am. Compl. ¶¶ 93–99.) The amended complaint also alleges that Ottey later committed fraud when he transferred funds "from Virginia to New Jersey" to pay off the loan for the Gusty Court property. (*Id.* ¶ 147.) Drawing reasonable inferences in favor of jurisdiction, as the court must, the court is satisfied that the allegations show Ottey had sufficient minimum contacts with Virginia to make the exercise of personal jurisdiction constitutionally reasonable.

2.  The amended complaint does not state a plausible RICO claim.

Counts 1 and 2, the two RICO claims, are alleged against Clayton Thompson, the Estate of Brian Thompson, Quincy Thompson, Jackson, Ottey, and Second Chance Homes (collectively, the "RICO Defendants"). Count 1 alleges that the RICO Defendants violated 18 U.S.C. § 1962(c) by participating in an enterprise's affairs through a pattern of racketeering activity. (Am. Compl. ¶¶ 128–51.) Count 2 alleges that they conspired to do the same in violation of 18 U.S.C. § 1962(d). (*Id.* ¶¶ 152–56.)

Section 1962(c), the focus of Count 1, makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To state a claim for a violation of § 1962(c), Ms. Thompson must sufficiently allege "(1) conduct (2) of

an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (footnote omitted). She also must allege that the RICO violation proximately caused her alleged injuries. *See Slay's Restoration, LLC v. Wright National Flood Ins. Co.*, 884 F.3d 489, 493 (4th Cir. 2018).

The RICO Defendants who have filed motions to dismiss—Quincy Thompson, Ottey, and Second Chance Homes—argue that the facts alleged in the amended complaint do not plausibly show that they were part of a RICO enterprise, that they engaged in a pattern of racketeering activity, or that their alleged actions proximately caused Ms. Thompson's injuries. (Quincy Thompson Mem. at 4–6 (Dkt. 9); Second Chance Homes Mem. at 6–10 (Dkt. 22); Ottey Mem. at 11–15.) The court finds that Ms. Thompson has not pled sufficient facts to show either the existence of a RICO enterprise or a pattern of racketeering activity.

### i.    *RICO enterprise*

Ms. Thompson alleges that the RICO Defendants formed an association-in-fact enterprise. (Am. Compl. ¶¶ 134, 137.) A RICO enterprise includes "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The "concept of an association in fact is expansive." *Boyle v. United States*, 556 U.S. 938, 944 (2009). It covers "a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Such an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* at 945 (quoting *Turkette*, 452 U.S. at 583). The Supreme Court has instructed that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the

- 16 -

enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. To form an enterprise, the individual members must display at least some level of coordination or collaboration. *See Rojas v. Delta Airlines, Inc.*, 425 F. Supp. 3d 524, 537 & n.6 (D. Md. 2019) (citing *Boyle*, 556 U.S. at 947 n.4).

Ms. Thompson alleges that the RICO Defendants formed an enterprise with a common purpose to "obtain pecuniary benefits by taking money and property from Ms. Thompson unlawfully." (Am. Compl. ¶ 139.) The facts alleged in the amended complaint provide little support for that claim. The allegations concerning Ottey and Second Chance Homes are especially sparse. Ms. Thompson states only that Ottey was Clayton Thompson's realtor in early 2024 and, through Second Chance Homes, purchased the Gusty Court property from Clayton Thompson in March 2024. (*See* Am. Compl. ¶¶ 105, 116–17.) Even if Ottey or Second Chance Homes had a relationship with other RICO Defendants, the limited factual allegations do not plausibly show that they associated with other RICO Defendants for the alleged common purpose, let alone with enough longevity to pursue that purpose. *Boyle*, 556 U.S. at 946. Their contacts with the Thompson family members evidently began in February 2024, more than three years after Brian and Clayton Thompson allegedly defrauded Ms. Thompson of her interest in the Gusty Court property. There is no indication that Ottey's relationship with Clayton Thompson extended beyond the March 2024 sale of the property. Instead, the § 1962(c) claims against Ottey and Second Chance Homes rest on conclusory assertions that they "directly participated in the operation/management" of the enterprise and committed acts to fulfill its purpose. (Am. Compl. ¶ 136(e)–(f).) Those assertions, without more, do not suffice to state a claim. *See, e.g., Grant v. Shapiro & Burson, LLP*, 871 F. Supp. 2d

462, 473 (D. Md. 2012) (granting Rule 12(b)(6) motion to dismiss RICO claim where the complaint alleged no facts showing that defendants functioned as a continuing unit).

The alleged facts also do little to demonstrate that the other four RICO Defendants functioned as a RICO enterprise. Brian Thompson, Clayton Thompson, Quincy Thompson, and Annette Jackson certainly had relationships with one another. But it is doubtful that they collaborated over a long-enough period as a continuing unit to pursue the alleged common purpose. Quincy Thompson and Jackson's participation began in the spring of 2022, when they allegedly obtained access to Ms. Thompson's Cenlar account and opened utility accounts in her name. (*See* Am. Compl. ¶¶ 67–68, 71.) Those events postdate both the quitclaim deed and Brian Thompson's death. Ms. Thompson does not explain how those actions, which occurred after she had lost ownership of the Gusty Court property, furthered the scheme to take her money or property. Nor does Quincy Thompson or Jackson's other alleged misconduct provide much evidence that they functioned as a "continuing unit" with other RICO Defendants. *Boyle*, 556 U.S. at 948. The allegations that they later removed some of Ms. Thompson's personal effects from the Gusty Court property over one or two days in February 2024 do not support an inference that they were collaborating with Clayton Thompson and Annette Jackson. (Am. Compl. ¶¶ 109–10.)

Finally, there is little factual support for finding that Brian and Clayton Thompson participated in a RICO enterprise. Ms. Thompson alleges that the father and son worked together to execute the fraudulent quitclaim deed and enter the loan into a forbearance plan. (*See id.* ¶¶ 40–57, 63.) That alleged collaboration consisted of a few discrete actions taken between October 2020 and October 2021; standing alone, it does not plausibly satisfy the

longevity requirement for an enterprise. *See, e.g.*, *Doe v. Burkman*, No. 1:24-cv-00181, 2025 WL
819115, at *6 (E.D. Va. Mar. 13, 2025) (granting motion to dismiss RICO claim because the
plaintiff's allegations of a two-year-long association were "insufficient as a matter of law to
satisfy the longevity requirement"). Much of Brian and Clayton Thompson's other alleged
actions—such as Brian Thompson's abduction and extortion of Ms. Thompson in September
2021 and Clayton Thompson's theft of her property in February 2024—appear to be
independent acts taken for their individual benefit.

Ultimately, the court need not resolve whether Ms. Thompson has pled enough facts
to satisfy the enterprise element for certain RICO Defendants. Even assuming that she has,
her § 1962(c) claim would fail, as she has not sufficiently alleged that any RICO Defendant
engaged in a "pattern of racketeering activity." 18 U.S.C. § 1962(c).

  *ii.* *Pattern of racketeering activity*

RICO defines "racketeering activity" as "any of a number of predicate acts, including
mail and wire fraud." *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000);
*see* 18 U.S.C. § 1961(1)(B). A pattern of racketeering activity requires at least two predicate
acts, but "simply proving two or more predicate acts is insufficient for a RICO plaintiff to
succeed." *Al-Abood*, 217 F.3d at 238; *see GE Inv. Private Placement Partners II v. Parker*, 247 F.3d
543, 549 (4th Cir. 2001). The plaintiff also must show "that the racketeering predicates are
related, *and* that they amount to or pose a threat of continued activity." *U.S. Airline Pilots Ass'n
v. AWAPPA, LLC*, 615 F.3d 312, 318 (4th Cir. 2010) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492
U.S. 229, 239 (1989)) (emphasis in original).

Predicate acts are related when they have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240. The "continued activity" requirement is "a temporal concept" that ensures the statute captures only "long-term criminal conduct." *Id.* at 241–42. Continuity "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. A plaintiff must show either closed-end continuity through "a series of related predicates extending over a substantial period of time" or open-ended continuity through a showing that the defendants' prior acts pose a threat of continued racketeering activity. *Id.* at 242.

To start, Ms. Thompson has not pled enough facts to show open-ended continuity. Nearly all the alleged racketeering activity had completed its course when Ottey and Second Chance Homes purchased the Gusty Court Property and Ms. Thompson's personal effects were removed from the house. "A plaintiff cannot demonstrate open-ended continuity if the racketeering activity has a 'built-in ending point, and the case does not present the necessary threat of long-term, continued criminal activity.'" *U.S. Airline Pilots Ass'n*, 615 F.3d at 318 (quoting *GE Inv.*, 247 F.3d at 549). Ms. Thompson attempts to demonstrate a threat of ongoing criminal activity by alleging that she "continues to be assaulted and extorted" and "face acts of financial fraud and identity theft," and that "[i]t does not appear as if the acts will end soon." (Am. Compl. ¶ 137.) But she does not provide any factual support for those allegations, which are too conclusory to "give rise to a reasonable expectation that the

racketeering activity will extend indefinitely into the future." *U.S. Airline Pilots Ass'n*, 615 F.3d at 318 (internal quotation marks omitted).

The next question, then, is whether Ms. Thompson can demonstrate a pattern through closed-ended continuity. "RICO liability is reserved for 'ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.'" *GE Inv.*, 247 F.3d at 549 (quoting *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989)). This requirement aims to "preserve a distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *Al-Abood*, 217 F.3d at 238; *see also Flip Mortgage Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988) (stating that "the heightened civil and criminal penalties of RICO are reserved for schemes whose scope and persistence set them above the routine" (internal quotation marks omitted)). Whether a series of predicate acts rises to the level of a RICO pattern "is a matter of criminal dimension and degree to be decided on a case-by-case basis." *Parcoil Corp. v. NOWSCO Well Serv., Ltd.*, 887 F.2d 502, 504 (4th Cir. 1989) (cleaned up). "Factors relevant to this inquiry include the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries." *Id.* The Fourth Circuit has instructed courts to be "cautious about basing a RICO claim on predicate acts of mail and wire fraud because it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *Al-Abood*, 217 F.3d at 238 (internal quotation marks omitted).

After reviewing the allegations in the amended complaint, the court concludes that Ms. Thompson has not alleged a series of predicate offenses with closed-ended continuity to

constitute a RICO pattern. Even if the court assumes she can demonstrate the necessary relationship between the predicates, the RICO Defendants' alleged criminal scheme was quite limited in scope. Most of the alleged criminal acts involved wire, mail, and financial institution fraud related to the transfer of Ms. Thompson's interest in the Gusty Court property, the management of the Cenlar loan account for that property, or the later sale of the property to Second Chance Homes. (*See* Am. Compl. ¶¶ 143–48.) A few of the alleged predicates extend beyond fraud.[5] But they do little to expand the scope of the criminal activity, as they, too, consist of efforts by Brian Thompson or his family to take Ms. Thompson's personal property or her interest in the house.

The fact that Ms. Thompson was the sole victim of the criminal activity further supports this conclusion. "There is no per se rule against a RICO claim involving only one victim." *Al-Abood*, 217 F.3d at 238. That said, the Fourth Circuit has held that fraudulent schemes targeting one victim did not constitute a pattern of racketeering activity, even when the alleged criminal activity spanned a much longer period of time. *See id.* at 238–39 (holding that a § 1962(c) claim failed as a matter of law where the main predicate acts were mail and

---

[5] For example, Ms. Thompson alleges that Brian Thompson committed kidnapping and extortion on September 18, 2021, (Am. Compl. ¶ 144), and that Ottey committed extortion when he "attempted to coerce [her] into signing a paper that conveyed her Property to him" on February 20, 2024, (*id.* ¶ 148). Ms. Thompson also alleges that Quincy Thompson, Jackson, and Ottey committed felony robbery "by threats of intimidation and other means not involving a physical weapon" when they removed her personal items from the Gusty Court property in 2024. (*Id.* ¶¶ 145–46, 148). She has not alleged facts that support those robbery predicates. Under West Virginia law, a robbery must involve "force or putting the person in fear." *State v. Neider*, 295 S.E.2d 902, 907 (W. Va. 1982). Ms. Thompson states only that she observed Quincy Thompson, Jackson, and Ottey taking her things from the property. (Am. Compl. ¶¶ 109–10, 123.) No factual allegations suggest those Defendants used force or threatened Ms. Thompson—or indeed communicated with her at all—when removing items from the house. Ms. Thompson alleges that Quincy Thompson and Jackson each committed robbery and one other predicate offense. (*See id.* ¶¶ 145–46.) Because she has not sufficiently pled that either committed robbery, she has failed to show they engaged in "at least two acts of racketeering activity." 18 U.S.C. § 1961(5); *see Doe 1 v. Varsity Brands, LLC*, Civil Action No. 6:22-2957, 2023 WL 4209799, at *16 (D.S.C. June 27, 2023) (collecting cases recognizing that a RICO plaintiff must allege that each defendant committed at least two racketeering predicates). Ms. Thompson alleges in passing that Jackson also "participated in . . . threats of murder," (Am. Compl. ¶ 136), but she offers no factual support for that bare allegation.

wire fraud, "and although they were related and involved three discrete schemes spanning several years, there was only one victim of the fraud"); *Flip Mortg. Corp.*, 841 F.2d at 538 (holding that alleged series of fraudulent acts over the course of seven years did not constitute a RICO "pattern" because the acts were "part of a single scheme perpetrated . . . against a single victim"); *Tudor Assocs., Ltd., II ex rel. Callaway v. AJ &AJ Servicing, Inc.*, 36 F.3d 1094 (Table), 1994 WL 510456, at *4 (4th Cir. Sept. 20, 1994) (holding that a scheme to defraud the plaintiff of money due under mortgages did not rise to the level of a RICO pattern because, although it lasted over ten years and involved millions of dollars, it involved a single scheme to injure a single victim).

The factual allegations in the amended complaint are extensive, but the criminal activity they describe is limited in scope, relatively short in duration, and affected only a single victim. The allegations do not support a reasonable inference that any RICO Defendant engaged in continued racketeering activity. Some of the events Ms. Thompson recounts are certainly troubling, but they do not involve "the sort of extended, widespread, or particularly dangerous pattern of racketeering which Congress intended to combat with federal penalties." *Flip Mortg. Corp.*, 841 F.3d at 538.

As Ms. Thompson has not alleged that the RICO Defendants engaged in a pattern of racketeering activity, the court will grant Quincy Thompson, Ottey, and Second Chance Homes's motions to dismiss the § 1962(c) claim in Count 1.[6] Those same pleading deficiencies

---

[6] Because the § 1962(c) is subject to dismissal for these reasons, the court does not address Quincy Thompson, Ottey, and Second Chance Homes's additional argument that Ms. Thompson has failed to allege proximate causation. (*See* Quincy Thompson Mem. at 6; Ottey Mem. at 14–15; Second Chance Homes Mem. at 10.) The court also need not determine

prevent Ms. Thompson from stating a § 1962(c) claim against the Estate of Brian Thompson,[7] Clayton Thompson, and Jackson. Courts have the authority to *sua sponte* dismiss claims against non-moving defendants that "integrally relate to claims against a party who has moved to dismiss." *Spivey v. JPMorgan Chase Bank, NA*, No. 3:22CV350, 2022 WL 2110691, at *3 (E.D. Va. June 10, 2022). Accordingly, the court will dismiss Count 1 in its entirety without prejudice.

Because the amended complaint does not state a substantive RICO claim under § 1962(c), the conspiracy claim necessarily fails as well. *See MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 111 n.12 (4th Cir. 2025) (citing *GE Inv.*, 247 F.3d at 551 n.2). The court will dismiss Count 2 without prejudice.

3. <u>The court will decline to exercise supplemental jurisdiction over Counts 3 through 10.</u>

Counts 3 through 10 of the amended complaint allege claims under Virginia statutory or common law. (*See* Am. Compl. ¶¶ 157–226.) Ms. Thompson asks the court to exercise supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367(a). (*Id.* ¶ 13.) She does not allege that this court could exercise original diversity jurisdiction over those claims. With the RICO claims dismissed, the court will decline to exercise supplemental jurisdiction over the state claims.

---

whether Counts 1 and 2 are barred by RICO's four-year statute of limitations, as Ottey and Second Chance Homes argue. (*See* Ottey Mem. at 9–10; Second Chance Homes Mem. at 4–5.)

[7] While Ms. Thompson has sued Quincy Thompson both individually and as the administrator for the Estate of Brian Thompson, (*see* Am. Compl. at 1), Quincy Thompson's motion to dismiss and related briefing address only the claims against Quincy Thompson in his personal capacity.

Federal courts have supplemental jurisdiction over state-law claims that "form part of the same case or controversy" as a federal claim. 28 U.S.C. § 1367(a). But a district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The court has "wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Henderson v. Harmon*, 102 F.4th 242, 251 (4th Cir. 2024) (quoting *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995)). "[G]enerally, when a district court dismisses all federal claims in the early stages of litigation . . . it should decline to exercise jurisdiction over any remaining pendent state law claims by dismissing those claims without prejudice." *Id.* (citation omitted). In deciding whether to exercise supplemental jurisdiction in this scenario, the court weighs multiple factors, including "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Shanaghan*, 58 F.3d at 110 (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

After balancing the relevant factors, the court finds they weigh in favor of declining supplemental jurisdiction over Ms. Thompson's state claims. The parties have engaged in some discovery, so dismissal at this stage may result in some inconvenience and duplicated effort. However, the numerous state-law counts do not implicate any matter of federal policy, and allowing a Virginia court to address them would best serve judicial economy. Fourth Circuit precedent "evince[s] a strong preference that state law issues be left to state courts." *Arrington v. City of Raleigh*, 369 F. App'x 420, 423 (4th Cir. 2010). Because the court concludes

- 25 -

that the balance of the factors favors dismissal, it will dismiss Counts 3 through 10 without prejudice.

## IV.    Motions for Default Judgment

Finally, the court will deny Ms. Thompson's motions for default judgment against Clayton Thompson, Jackson, and Hicks.  For one, she did not move for or obtain a Clerk's entry of default before filing the motions for default judgment, as Federal Rule of Civil Procedure 55 requires.  *See* Fed. R. Civ. P. 55(a); *see Shelton v. Marshall*, 724 F. Supp. 3d 532, 540 (W.D. Va. 2024).  Even if Ms. Thompson had complied with that procedural requirement, she is not entitled to a default judgment against Clayton Thompson, Jackson, or Hicks. Default judgment is appropriate only when "the well-pleaded allegations in [the plaintiff's] complaint support the relief sought."  *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001).  Because the court will dismiss the amended complaint in its entirety, it will deny Ms. Thompson's motions for default judgment.

## V.    Conclusion

For the reasons outlined above, the court will **GRANT** the motions to dismiss filed by Quincy Thompson (Dkt. 17), Samson (Dkt. 19), Second Chance Homes (Dkt. 21), Cenlar (Dkt. 36), and Ottey (Dkt. 49).   Counts 1 and 2 of the amended complaint will be **DISMISSED without prejudice** for failure to state a claim on which relief may be granted. The court will decline to exercise supplemental jurisdiction over Counts 3 through 10, and those claims will be **DISMISSED without prejudice**.   The court will **DENY** Ms. Thompson's motions for default judgment against Clayton Thompson (Dkt. 44), Jackson (Dkt. 45), and Hicks (Dkt. 46).

Ms. Thompson may file a motion for leave to amend her complaint within **21 days** of the date of the accompanying Order.  If she does not file a motion for leave to amend by that date, the court will dismiss Counts 1 and 2 with prejudice and close this case.

An appropriate Order shall accompany this Memorandum Opinion.

**ENTERED** this 17th day of October, 2025.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE